6ib 91
151 617

# Meadowcraft *et al. versus* The Standard Fire Insurance Company.

1. A policy showed an insurance against fire on machinery, consisting of cards, *pickers*, &c., " contained in the first story of a four-story and basement brick building," &c. The *pickers* were in a one-story building, the floor on a level with the first story, built with bricks, joining into the main building, entering from it through a frame building adjoining, and then through a large iron door, " as if going from the house into the kitchen." There were no pickers except in the one-story room, *Held*, that the picker-room was part of the first story in which the goods were insured.

2. The insurance agent who effected the insurance knew the location of the pickers, and there was no misrepresentation to him. *Held*, that the company were bound by his acts.

3. The primary object was to insure the property described; its precise location was subordinate, and in the absence of misrepresentation as to location the presumption is that the parties treated that as of less importance.

4. Declarations of the principal agent of the company to the agent who effected the insurance that the company would not insure the pickers would have no effect against the written policy.

February 15th 1869. Before THOMPSON, C. J., AGNEW, SHARSWOOD and WILLIAMS, JJ. READ, J., at Nisi Prius.

Error to the District Court of *Philadelphia:* No. 165, to January Term 1868.

This was an action of assumpsit, brought to December Term 1863, by James Meadowcraft & Co. against the Standard Fire Insurance Company of New York for the loss by fire of *pickers* insured by the defendants.

The material parts of the policy are as follows :—

" By this policy of insurance the Standard Fire Insurance Company of the City of New York, in consideration of seventy-five dollars, to them paid by the insured hereinafter named, the receipt whereof is hereby acknowledged, do insure James Meadowcraft & Co. against loss or damage by fire, to the amount of twenty-five hundred dollars.

" On machinery, consisting of cards, mules, *pickers*, shafting, belting and fixtures, used for spinning and manufacturing carpet yarn . . . . . . . . . . . $2250.00

" On stock of raw materials, and yarn finished and in process . . . . . . . . 250.00

$2500.00

[Meadowcraft *v.* Standard Fire Insurance Co.]

" All contained in the first story of a four-story and basement brick slate roof building, situate on the corner of Coral and Letterly streets, Nineteenth Ward, Philadelphia."

The situation of the premises, &c., appear in the annexed draft, which, however, had not been furnished to the company, nor was there any written application for insurance.

ADAMS STREET.

YARD.

YARD.

CORAL STREET.

PICKER HOUSE.

BRICK. ONE STORY.

ONE STORY FRAME.

ONE STORY FRAME.

MAIN BUILDING, 4½ STORIES AND BASEMENT, BRICK.

YARD.

LETTERLY STREET.

The plaintiffs gave the preliminary proof of fire, damage, &c., on which no question was raised.

They then called James Thompson, who testified that he effected the insurance for plaintiffs, as agent of the defendants, from whom he received a commission.

James Coop testified: " The fire originated in the picker-house; there was an iron door between, and the blaze could not get into the building. * * A person could go through the mill to where the pickers stood, and if not well acquainted with the building would not know he was going from one building to the other. The pickers were on the floor level with the mill-floor, the same as if you were going from the house into the kitchen. Pickers are part of the machinery of a cotton-mill. Meadowcraft occupied the

[Meadowcraft v. Standard Fire Insurance Co.]

whole of the building, and all the machinery on the first floor. * *. It would appear that it was built at the same time by the bricks being joined in together. There never were any pickers except in that building. The pickers were put in the first floor in this building adjoining. There was an entrance from Coral street."

William Scholes testified: "The fire was confined to the picker-house. The iron door was to prevent the fire getting into the next room. Meadowcraft's business was spinning. There was no picker in the main building. * * The floor of the two rooms was level, it was the same as going out of a house into a kitchen, they were only divided for the purpose of precaution. Pickers are more dangerous than other parts of the machinery, and we use more precaution, for the large room had been partitioned off. This door was only shut at night. This iron door is two and a half yards wide and nine feet high—as big nearly as a barn door. The picker-house and the pickers were destroyed; also the shafting and belting."

Plaintiffs closed.

The defendants called William D. Sherrerd, who testified: "I was agent of the defendants. James Thompson, as agent of Meadowcraft & Co., applied to me for the policy. This policy was delivered to Mr. Thompson. I never saw any one but Thompson. He brought this policy into my office and asked me to give a policy in these terms. I told him I would not do it. Would take it for 2 or 3 per cent. I refused the risk. Would not take it on any premium. Saw rags there, and things which were considered uninsurable. On account of the iron doors we were induced to take the risk."

And on cross-examination: "I refused to insure according to the terms set forth in this policy. I did insure and did not know what he had in the building. I said I would not insure the rag-pickers. There are different kinds of pickers. I knew where the rag-pickers were. I would put anything in the policy that Thompson asked. I don't know that Thompson follows the business of an insurance agent. He has brought policies to our office and we made him a discount, the same as any one else. He did not state that he was the agent of Meadowcraft & Co. Did not ask him the question. I never saw the other side at all in this matter. I said I would not run the risk."

Also Hickock, who testified: "I was in office of Mr. Sherrerd. The picker-house was burned. There was an iron door leading out of the picker-house to the north. I never saw the roof. The iron door separated it from the other; it was attached to the main building and joining it. The picker-house was attached at the angle to the angle of the main building. There was no door from the picker-house to the main building. An iron door from

[Meadowcraft *v.* Standard Fire Insurance Co.]

the further end of the side of the picker-house led into a frame shed, and a door led out of the main building into this shed."

In charging the jury the court (Hare, J.) reserved the question:

"Whether the policy of insurance covered the goods and machinery contained in the picker-house, or only those in the main building. In other words, whether the articles in the picker-house, at the time of the fire, were within the meaning of the policy 'contained in the first story of the four-story and basement, brick, slate-roof building,' mentioned and referred to in the policy, upon which the plaintiff brings his suit."

The jury found for the plaintiffs $1175. The court afterwards entered judgment for the defendant on the question reserved; which, on removal of the case to the Supreme Court by the plaintiffs, was assigned for error.

*R. P. White* and *George H. Earle*, for plaintiffs in error.

*T. Cuyler*, for defendants in error.

The opinion of the court was delivered, May 11th 1869, by

THOMPSON, C. J.—The policy in this case sets out that in consideration of $75, James Meadowcraft & Co. is insured "against loss or damage by fire to the amount of $2500, on machinery, consisting of cards, mules, pickers, shafting, belting and fixtures, used for spinning and manufacturing carpet yarn," "contained in the first story of a four-story and basement brick and slate roof building, situate on the corner of Coral and Letterly streets, Nineteenth Ward, Philadelphia.

This was a valued policy attaching to the machinery of the plaintiffs in the building described, and covered "pickers" as part of that machinery in express terms. The premium paid applied to them as well as to any other portion of the property insured. The "pickers" were that portion of the machinery which was destroyed by the fire, and the insurers refuse to pay the loss, because, they allege, that they were not in the first story of the building described, and therefore not covered by the policy.

It was not pretended on the trial, that there had been misrepresentation in regard to the location of the pickers. Thompson, who acted for the company in taking the insurance, and for which he received a percentage from it, knew all about it. It is, therefore, perfectly evident, that he regarded the picker-room as part of the first story of the building, and acting for the company in the matter, they are bound by his acts after receiving the premium, in the absence of any fraud practised on him. Situated as the room was, substantially a part of the first story of the main building, it was competent to cover the property in it by assent

[Meadowcraft *v.* Standard Fire Insurance Co.]

of all parties, and not competent for either to refuse to be bound after doing so. Coop and Scholes, witnesses on the part of the plaintiffs, describe the picker-room as separated from the main room in the first story by a large iron door, as large as a barn door, on a level with the mill floor, and they concur substantially in saying, "that unless a person was well acquainted with the building he might go right through the mill into the picker-house without knowing that he was going from one building to another * * * the same as if you were going from the house into the kitchen." They further testified that the picker-room was built with the main building.

It is very evident to me, that the insurers as well as the insured regarded this room and the main or mill-room as part of the first story. This is what the contract in effect says, and the jury found the fact to be so. It was a question on the trial, whether it was not strictly so in fact. In this doubtful attitude of the fact, the only rational interpretation of the terms of the policy, is, that it was intended to be so treated by the company when they insured the property in the picker-room, as in the first story of the main building. The primary object of the policy was to insure the property described; its precise location was a subordinate matter, which the parties might regard and treat as of less importance, and in the absence of any false representations by the insured, as to the precise location, it is to be presumed they so dealt. No written application was made or required, it seems. The agent of the company took the description of the property, and the amount at which it was to be insured, and procured the policy for the plaintiffs. Under these circumstances, I see not with what propriety the company can claim that they are not bound to make good the loss as they have undertaken. It was not very clearly shown that the picker-room was not a portion of the main building, and it could have been so held, for the parties so held it by treating it as such. We think, therefore, that the learned judge erred in entering judgment on the reserved point for the defendants, *non obstante veredicto.*

What passed between Thompson, an agent of the company, and Sherrerd, another agent, never communicated to the insured, could not affect them. Even supposing Thompson to have been an agent for the insured, Sherrerd's declaration that he would not insure pickers, could have no effect in the face of the written agreement of insurance of them, without the slightest testimony to show that he was induced thereto by any declarations or representation on the part of the insured or their agent. There is no room for escape from the policy on the ground of mistake in introducing into it the pickers. And we have shown, I think, that it is not to be got rid of on the minor point, that the room

[Meadowcraft *v.* Standard Fire Insurance Co.]

where the injury occurred was not in fact, or not considered, part of the first story of the brick building described.

The judgment is therefore reversed.

And now, May 11th 1869, the judgment of the District Court in the above entitled suit is reversed, and judgment is now here entered in favor of the plaintiffs on the verdict, for the sum of $1715 damages, with interest from the 10th day of May 1865, and costs.